**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| METRO ONE TELECOMMUNICATIONS, INC., | No. 11-70819 |
| *Petitioner-Appellant*, | Tax Ct. No. 12651-07 |
| v. | |
| COMMISSIONER OF INTERNAL REVENUE, | OPINION |
| *Respondent-Appellee*. | |

Appeal from a Decision of the
United States Tax Court

Argued and Submitted
October 12, 2012—Portland, Oregon

Filed December 19, 2012

Before: Barry G. Silverman, Richard R. Clifton,
and N. Randy Smith, Circuit Judges.

Opinion by Judge N.R. Smith

# SUMMARY[*]

## Tax

The panel affirmed the Tax Court's judgment that Metro One Communications was not entitled to tax relief under § 56 of the Internal Revenue Code ("the Relief Rule"), which permitted taxpayers subject to the Alternative Minimum Tax to offset up to 100% of their taxable income with net operating losses.

The panel held that the term "carryovers" as used in the Relief Rule means net operating losses that are carried forward from a tax year to a later tax year. Therefore, Metro One Communications cannot use net operating losses that are carried back to 2001 or 2002 from a later tax year to take advantage of the Relief Rule.

## COUNSEL

Neil D. Kimmelfield, Lane Powell PC, Portland, Oregon, for Petitioner-Appellant.

Gilbert S. Rothenberg, Acting Deputy Assistant Attorney General; Bethany B. Hauser (briefed and argued) and Richard Farber (briefed), Tax Division, United States Department of Justice, Washington, D.C., for Respondent-Appellee.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

## OPINION

N.R. SMITH, Circuit Judge:

Between 2002 and 2009, § 56 of the Internal Revenue Code[1] provided tax relief by permitting taxpayers subject to the Alternative Minimum Tax (AMT) to offset up to 100% of their taxable income with net operating losses (NOLs).[2] To qualify for this relief, NOLs had to be (1) "carryovers to" the 2001 or 2002 tax years, or (2) "carried back from" the 2001 or 2002 years to a prior tax year. The plain meaning of the term "carryovers" prevents taxpayers from using NOLs that are carried *back* to 2001 or to 2002 from a later tax year to take advantage of the Relief Rule. Therefore, we affirm the Tax Court's assessment of a deficiency, because Metro One Telecommunications may not take advantage of the Relief Rule with NOLs it carried back from the 2003 and 2004 tax years to 2002.

## I.  Facts

Metro One Telecommunications was a company based in Beaverton, Oregon that operated call centers throughout the United States. In this case, Metro disputes the determination of a deficiency by the Commissioner of the Internal Revenue

---

[1] We refer to the Internal Revenue Code as "I.R.C." or "the Code." Further, all citations to "I.R.C." or "§" are to the Code, codified at Title 26, United States Code.

[2] Typically, the amount of the deduction for NOLs that a taxpayer subject to the AMT is able to claim is limited to 90% of the taxpayer's taxable income. *See* § 56(d)(1)(A)(i)(II).

Service based on Metro's use of NOLs accumulated in 2003 and 2004 to completely offset its 2002 taxable income.

For the 2002 tax year, Metro was subject to the AMT.[3] In 2004, Metro claimed a refund for 2002 by offsetting 100% of its 2002 taxable income with NOLs that it had accumulated in 2003 and 2004. In response, the Commissioner sent Metro a Notice of Deficiency in the amount of $630,159. Metro then filed a petition with the United States Tax Court. Agreeing with the Commissioner, the court imposed the amount of the deficiency.[4] Metro then appealed.

## II. Standard of Review

We review "the Tax Court's interpretation of the Internal Revenue Code . . . de novo." *Adkison v. Comm'r*, 592 F.3d 1050, 1052 (9th Cir. 2010).

## III.   Analysis

### A. Background

We determine here whether a taxpayer, subject to the AMT in 2002 may (under the applicable version of the Code) reduce its income tax liability by claiming a deduction for NOLs that arose in later years. Section 172 of the Code permits taxpayers to deduct NOLs from taxable income as a

---

[3] The AMT is imposed to the extent that the amount determined to be the "tentative minimum tax" exceeds the amount of the "regular tax." § 55(a).

[4] The Tax Court reached its decision without a trial, based on stipulated facts and exhibits. *See* Tax Ct. R. 122.

net operating loss deduction (NOLD). I.R.C. § 172(a). A "net operating loss" arises in a given tax year, if the sum of the taxpayer's deductions in that year exceeds the amount of the taxpayer's taxable income. § 172(c). Further, § 172 permits taxpayers to apply NOLs that arise in a given tax year as deductions in other tax years. *See* § 172(b)(1)(A). Relevant here, § 172(b)(1)(A) specifies that:

> a net operating loss for any taxable year–
>
> (i) shall be a net operating loss carryback to each of the 2 taxable years preceding the taxable year of such loss, and
>
> (ii) shall be a net operating loss carryover to each of the 20 taxable years following the taxable year of the loss.

According to this paragraph, a "carryback" is any NOL that is "carried" to one of the 2 years preceding the tax year in which the loss arises. Conversely, a "carryover" (sometimes called a "carryforward") is any NOL that is "carried" to one of the 20 years following the taxable year in which the loss arises. For a given tax year, the amount of the NOLD is the sum of the amount of NOL carrybacks plus the amount of NOL carryovers that are carried to that year. § 172(a).

If a taxpayer is subject to the AMT, the taxpayer must claim an alternative tax net operating loss deduction (ATNOLD) instead of the NOLD permitted by § 172.

§ 56(a)(4). Under the Tax Relief Act of 2004,[5] § 56(d)(1) defined ATNOLD as:

> the net operating loss deduction allowable for the taxable year under section 172, except that–
>
> (A) the amount of such deduction shall not exceed the sum of–
>
> (i) the lesser of–
>
> (I) the amount of such deduction attributable to net operating losses (other than the deduction described in clause (ii)(I)), or
>
> (II) 90 percent of alternative minimum taxable income determined without regard to such deduction, plus
>
> (ii) the lesser of–

---

[5] The version of § 56(d) that applies to Metro in this case is the version of § 56 as enacted by the Job Creation and Worker Assistance Act of 2002, Pub. L. 107-147, § 102(c) (2002) and amended by the Working Families Tax Relief Act of 2004, Pub. L. 108-311, § 403(b) (2004). Unless otherwise indicated, all citations to I.R.C. § 56 refer to that version, which we refer to (for the sake of convenience) as the "Relief Rule," because it provided tax relief by permitting AMT taxpayers to use NOLs to reduce their tax liability. References to the "original" Relief Rule refer to the version of the Rule enacted by the Job Creation and Worker Assistance Act of 2002, unamended by the Working Families Tax Relief Act of 2004. Congress eliminated the Relief Rule in 2009. *See infra* note 13.

(I)  the amount of such deduction attributable to the sum of carrybacks of net operating losses from taxable years ending during 2001 or 2002 and *carryovers of net operating losses* to taxable years ending during 2001 and 2002 . . . .

Job Creation and Worker Assistance Act of 2002, Pub. L. 107-147, § 102(c) (2002) [hereinafter Jobs Act of 2002], *as amended by* Working Families Tax Relief Act of 2004, Pub. L. 108-311, § 403(b) (2004) [hereinafter Tax Relief Act of 2004] (emphasis added).  This section limits the amount of the ATNOLD that can be claimed by a taxpayer who is subject to the AMT.  In general, this limit is 90% of the taxpayer's alternative minimum taxable income (AMTI), or the amount of NOLs, whichever is lesser.  *Id.* § 56(d)(1)(A)(i).  On the other hand, under the Relief Rule, there is no limit (up to the amount of taxable income) on the amount of the ATNOLD that a taxpayer can claim in a given taxable year, if those NOLs are carried *from* 2001 or 2002 *to* an earlier tax year ("carrybacks"), or *to* 2001 or 2002 *from* an earlier tax year ("carryovers").  *Id.* § 56(d)(1)(A)(ii).

Ultimately, we address here whether the term "carryovers of net operating losses" in the Relief Rule includes (1) *both* NOLs that are carried to a later tax year ("carryforwards") *and* NOLs that are carried to a preceding tax year ("carrybacks"), or (2) only carryforwards.  Metro argues that "carryovers" means both carryforwards and carrybacks, and therefore it was entitled to use NOLs from 2003 and 2004 as "carrybacks" to offset 100% of its taxable income in 2002. The Commissioner disagrees, arguing that, as used in the Relief Rule, "carryovers" is a synonym for carryforwards, so the amount of the 2002 ATNOLD attributable to NOLs that

Metro carried back from 2003 and 2004 was, like any other NOL carried under § 172, limited to 90% of Metro's 2002 AMTI.

Thus, under the Commissioner's interpretation, Metro would be able to carry back only $11,182,013.00 of its 2004 NOLs to 2002. That amount would increase to $14,332,806.00 under Metro's interpretation of the Relief Rule, because the ATNOLD would not be limited to 90% of Metro's 2002 AMTI. Therefore, if Metro is correct, it would be able to claim an additional $3,150,793.00 ATNOLD against its 2002 AMTI, reducing its taxable income for that year to $0.00. However, the plain meaning of "carryovers" indicates that the Relief Rule does not apply to NOLs that are carried back under these circumstances. We therefore affirm the Tax Court.

### B. The plain meaning of carryovers refers only to items that are carried from an earlier period to a later one.

When interpreting a statute, we must start with the language of the statute. *Williams v. Taylor*, 529 U.S. 420, 431 (2000). Moreover, "[i]n the absence of an indication to the contrary, words in a statute are assumed to bear their ordinary, contemporary, common meaning." *Walters v. Metro. Educ. Enters., Inc.*, 519 U.S. 202, 207 (1997) (internal quotation marks omitted).

The term "carryovers" ordinarily and commonly refers only to something that is carried from an earlier period to a later one—only to carryforwards. To ascertain the plain meaning of terms, we may consult the definitions of those terms in popular dictionaries. *Af-Cap, Inc. v. Chevron*

*Overseas (Congo) Ltd.*, 475 F.3d 1080, 1088 ("When determining the plain meaning of language, we may consult dictionary definitions."). *Black's Law Dictionary* defines a "carryover" as "[a]n income-tax deduction (esp. for a net operating loss) that . . . may be taken in a later period . . . ." *Black's Law Dictionary* 242 (9th ed. 2009); *Electrolux Holding, Inc. v. United States*, 491 F.3d 1327, 1328 n.2 (Fed. Cir. 2007) (defining "carryovers" in § 1212 by reference to *Black's*). Likewise, *Webster's Third New International Dictionary* contains multiple definitions of "carry over," all of which suggest movement from one period of time to a later period of time. *Webster's Third New International Dictionary* 344 (1993) (*e.g.*, "to hold over . . . for another season"). Courts also commonly employ "carryovers" for this meaning. *E.g., Kansas v. Colorado*, 543 U.S. 86, 102 (2004); *In re Grand Jury Subpoenas Duces Tecum*, 78 F.3d 1307, 1312 n.11 (8th Cir. 1996); *United States v. Gregory*, 871 F.2d 1239, 1243 (4th Cir. 1989) ("Of these, 19 were new hires and the remaining 11 were carryovers from the previous administration."); *Hoots v. Pennsylvania*, 672 F.2d 1124, 1129 (3d Cir. 1982). None of these definitions or usages suggest that the ordinary meaning of "carryover" encompasses movement from a point in time *backward* to an earlier point in time. Therefore, according to the plain meaning of "carryovers," the Relief Rule does not apply to carrybacks of NOLs.

It becomes even more clear that Congress used "carryovers" in the Relief Rule as a synonym for "carryforwards" after considering the relationship between § 56 and § 172. *See Samantar v. Yousuf*, 130 S. Ct. 2278, 2289 (2010) ("[W]e do not . . . construe statutory phrases in isolation; we read statutes as a whole.") (quoting *United States v. Morton*, 467 U.S. 822, 828 (1984)). Section 56 is

closely related to § 172, because § 56 "define[s] ATNOL by expressly incorporating the definition of regular NOL in § 172 and then enumerating specific exceptions . . . ." *Kadillak v. Comm'r*, 534 F.3d 1197, 1203 (9th Cir. 2008). Accordingly, § 172 defines NOL as the sum of two parts: (1) the *carrybacks* to that year of NOLs and (2) the *carryovers* to that year of NOLs. § 172(a). Paralleling § 172, the Relief Rule addresses each component of the NOLD: The amount of the NOLD "attributable to the sum of carry*backs* of net operating losses from taxable years ending during 2001 or 2002" is not subject to the 90% limit typically imposed on NOL carrybacks. § 56(d)(1)(A)(ii)(I) (emphasis added). Likewise, the amount of the NOLD attributable to "carry*overs* of net operating losses to taxable years ending during 2001 and 2002" is also not subject to that limit. *Id.* (emphasis added). Because Congress used "carryovers" in the Relief Rule to refer to the part of the NOLD computed under § 172 with the same label, it intended the words to have the same meaning.

Additionally, we note that Congress could have easily and clearly extended the benefit of the Relief Rule to taxpayers like Metro who carried back NOLs from tax years after 2002, without using "carryovers" contrary to its plain meaning. Inserting the words "to or" into the phrase "carrybacks of net operating losses from taxable years ending during 2001 or 2002" would have this effect. The resulting phrase would read: "carrybacks of net operating losses *to or from* taxable years ending during 2001 or 2002." However, Congress elected not to insert those words into the text of the statute. If Congress did intend to extend the Relief Rule to NOLs that a taxpayer carried back from tax years later than 2002, it would be odd to do it by using the word "carryovers"

contrary to its plain meaning, when simply adding two words would have produced the same effect with more clarity.

We understand that Congress has used the term "carryovers" in other parts of the tax code to refer to both "carryforwards" and "carrybacks."[6] However, that fact does not suggest that "carryovers" must have a non-ordinary meaning in the Relief Rule. Such uses only indicate that Congress sometimes uses "carryovers" in an out-of-the-ordinary way.[7] The varied uses of the term "carryovers" in the Code also explain why we cannot, here, assume "that identical words used in different parts of the same act are intended to have the same meaning." *Sorenson v. Sec'y of Treasury of United States*, 475 U.S. 851, 860 (1986) (internal quotation marks omitted). Clearly, Congress intended to use "carryovers" in some provisions of the Code to mean both "carryforwards" and "carrybacks," and in other provisions, to mean only "carryforwards." Therefore, we cannot adopt a uniform definition of the term "carryovers" applicable to every usage of the term in the Code. Rather, we only confirm that, in the Relief Rule, "carryovers" means "carryforwards."

Metro argues that we should reject the plain meaning of "carryovers" and instead follow the canon that "where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and

---

[6] As examples of these statutes, Metro cites I.R.C. §§ 1362(e)(6)(A), 1371(b), 535(b)(7).

[7] In fact, Congress also uses the term "carryovers" in sections other than 56 and 172 according to its plain meaning. *E.g.,* §§ 45A(d)(2), 50(a)(3), 50(c)(2).

purposely in the disparate inclusion or exclusion." *United States v. Wahid*, 614 F.3d 1009, 1014 (9th Cir. 2010). However, where the plain meaning rule has provided a clear answer, we do not need to look to other canons of statutory construction. *See United States v. Harrell*, 637 F.3d 1008, 1010 (9th Cir. 2011) (quoting *Hughes Aircraft Co. v. Jacobsen*, 525 U.S. 432, 438 (1999)). Nevertheless, Metro also argues that our exclusive reliance on the plain meaning of the statute's text, rather than other canons of construction, "may unnecessarily establish precedent regarding the relative weight given to competing canons." This concern is moot. It is already well-settled that, in the realm of the canons of statutory construction, the plain meaning rule is "preeminent." *See McDonald v. Sun Oil Co.*, 548 F.3d 774, 780 (9th Cir. 2008). Therefore, regardless of what other canons of statutory construction might suggest, under the plain meaning of the text, "carryovers" in the Relief Rule means "carryforwards."

Relying on *Benton v. Commissioner*, 122 T.C. 353, 370 (2004), Metro also argues that we should abandon the plain meaning of "carryovers," and instead define the term according to its purpose. However, the *Benton* court's implicit construction of the term "carryovers" in § 1398 to include carrybacks does not change our conclusion. Section 1398 imposes conditions on the use of NOLs in and after a chapter 7 or chapter 11 bankruptcy case. I.R.C. § 1398(a); *Benton*, 122 T.C. at 370. Under § 1398(g)(1), the bankruptcy estate succeeds to the debtor's "net operating loss carryovers determined under section 172" upon the commencement of a bankruptcy case. After the case terminates, the debtor then succeeds to the tax aspects of the estate (including NOLs specified in § 1398(g)(1)), "but taking into account that the

transfer is from the estate to the debtor instead of from the debtor to the estate." § 1398(i).

Based on these provisions, the Tax Court in *Benton* concluded that "the losses succeeded to [by the debtor] from the estate may be used, to the extent permitted in section 172 . . . ." *Benton*, 122 T.C. at 376. Because § 172 provides for NOLs to be carried back, the court's conclusion implies that the debtor could carry back NOLs that he inherited under § 1398(i). Necessarily, this means that the Tax Court read the term "carryovers" in § 1398(g)(1)—which defines the tax attributes that the debtor succeeds to—as including NOL carrybacks.

The Tax Court's implicit interpretation of § 1398(g)(1) in *Benton* does not undermine our conclusion that Congress used "carryovers" according to its ordinary meaning in the Relief Rule. Assuming that the Tax Court's analysis is correct, we can accept that § 1398 is another instance in the Code where Congress used "carryovers" to refer to both carryforwards and carrybacks.[8] At the same time, we recognize that the plain meaning of "carryovers" could not be applied to § 1398(g)(1) for reasons that do not prevent its application in the Relief Rule. If "carryovers" in § 1398(g)(1) meant only "carryforwards," then § 1398(j)(2)(B), which prohibits a debtor from offsetting pre-petition income by carrying back NOLs it inherits from the bankruptcy estate, would serve no purpose. Section 1398(g)(1) would already effectively bar *any* NOLs from being carried back, because the debtor would not inherit them from the bankruptcy estate. Thus, the plain meaning of the term "carryovers" could not apply in § 1398(g)(1) without

---

[8] *See supra* notes 6–7 and accompanying text.

rendering § 1398(j)(2)(B) "meaningless or superfluous." *United States v. Cabaccang*, 332 F.3d 622, 627 (9th Cir. 2003). The Relief Rule does not present the same structural problem. Therefore, at most, *Benton* confirms that the term "carryovers" is not always used according to its ordinary meaning.[9] The case does not suggest, however, that Congress used "carryovers" in the Relief Rule to mean something other than its plain meaning.

### C. Legislative history confirms that Congress intended "carryovers" in § 56 to have its plain meaning.

The plain meaning also does not "produce a result demonstrably at odds with the intentions of [the Rule's] drafters." *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 242 (1989); *see also Albertson's, Inc. v. Comm'r*, 42 F.3d 537, 545 (9th Cir. 1994). Although legislative history can be read as an expression of the intention of the legislature, it is certainly not the best expression. *See Lyons*

---

[9] The parties make a distinction between "functional" and "non-functional" uses of the term "carryover" in the Code. "Carryovers" in § 1398(g)(1) would be a functional use of the term, according to Metro, because its meaning cannot be determined by looking to the surrounding text. Thus, Metro argues that, "*Benton* shows that it is appropriate for a court to determine the meaning of the word" that is used "functionally" by what the "operative text" of the section it appears in is "intended to accomplish." However, unlike in this case, the Tax Court in *Benton* derived the "purpose" of § 1398 by analyzing general principles of tax and bankruptcy law, and the operation of § 1398 in light of those principles. 122 T.C. at 373–74. Here, Metro asks us to derive a "purpose" from the Relief Rule's thin legislative history. As described below, *infra* Part III.C, we are not persuaded that the legislative history supports Metro's interpretation, certainly not enough to overcome the plain meaning of the language used in the statute.

*v. Mendez*, 303 F.3d 285, 293 (3d Cir. 2002) ("[T]he text of the statute is the best expression of the intent of Congress."). Rather, it is "often murky, ambiguous, and contradictory." *Gonzalez v. Arizona*, 677 F.3d 383, 450 n.1 (9th Cir. 2012) (Rawlinson, J., concurring in part and dissenting in part) (quoting *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 568 (2005)), *cert. granted sub nom. Arizona v. Inter Tribal Council of Arizona, Inc.*, 133 S. Ct. 476 (2012).

Here, Congress has given us very little legislative history to go on:[10]

> the September 11, 2001 attacks have caused adverse effects to the U.S. economy. Thousands of Americans have lost jobs. Consumer confidence and investor confidence are low. The Committee believes that it is necessary to spur economic growth and job creation and help struggling businesses and unemployed workers. The provisions approved by the Committee will stimulate and strengthen the economy.

H.R. Rep. No. 107-251, at 18 (2001). Parsing the general language in this passage, Congress apparently enacted the Relief Rule (among other legislation) to "stimulate and strengthen the economy" in response to the economic

---

[10] This fact distinguishes this case from *Albertson's*. Had the court in that case followed the plain meaning, it would have created a loophole, permitting businesses to avoid a disincentive that Congress implemented to "encourage employers to create qualified [deferred compensation] plans for their employees." *Albertson's*, 42 F.3d at 543–44. Unlike that case, adopting the plain meaning of "carryovers" here will not compromise a statutory mechanism that Congress implemented to further its purpose.

downturn that followed the terrorist attacks of September 11, 2001. Specifically, Congress sought to strengthen the economy by "spur[ring] economic growth and job creation and help[ing] struggling businesses and unemployed workers." Temporally, Congress was apparently targeting an immediate problem, because it employed the past tense to describe the source of economic downturn: "The terrorist attacks . . . *have affected* the United States in numerous ways. In addition to the [lives lost], the September 11, 2001 attacks *have caused* adverse effects to the U.S. economy." H.R. Rep. No. 107-251, at 18 (emphasis added). Thus, Congress enacted the Relief Rule to address an economic slowdown that existed at the time of its enactment.

Consistent with this understanding of Congress's intent, the original Relief Rule would have had its primary economic effect in 2002 and 2003 by providing businesses with extra cash as a result of refunds and deductions generated during the 2001 and 2002 tax years. Originally, the Relief Rule only applied to "carrybacks of net operating losses for taxable years ending during 2001 or 2002 and *carryforwards* of net operating losses to taxable years ending during 2001 and 2002." Jobs Act of 2002 § 102(c) (emphasis added). Obviously, the term carryforwards[11] does not include carrybacks. Thus, after 2002, taxpayers would have been unable to take advantage of the Relief Rule by carrying back NOLs generated in those years to offset 2001 or 2002 income. Therefore, the original Relief Rule permitted an AMT taxpayer to free up cash that would otherwise be subject to taxation in only two ways. First, if the taxpayer sustained losses in 2001 or 2002 sufficient to give rise to

---

[11] "Carryforwards" was replaced by the term "carryovers" when the Relief Rule was amended by Tax Relief Act of 2004 § 403(b).

NOLs, it could carry back those NOLs to prior tax years. The Relief Rule would permit such a business to offset an additional 10% of the income in those prior tax years with its 2001–02 NOLs that it could not have offset under the pre-Relief Rule version of § 56(d)(1)(A). This would give rise to a refund, providing the business with additional cash in 2002 or 2003—the years in which refunds from 2001 and 2002 would have been received.

Second, a business could also free up cash by carrying forward unused NOLs from previous tax years to 2001 or 2002, potentially offsetting all of its taxable income in those years. Obviously, the direct economic effect of this part of the Rule would not persist past 2003, because 2002 would be the last tax year that the Rule would have permitted an AMT taxpayer to completely offset its taxable income with NOLs. Therefore, judging by the economic effects of the original Relief Rule, Congress enacted the Rule to stimulate the economy by providing businesses with additional cash, primarily in 2002 and 2003.[12] Because applying the plain meaning of "carryovers" to the Relief Rule would have the

---

[12] Contrary to Metro's argument, Congress did not intend to change the economic effect of the original Relief Rule when it changed "carryforwards" to "carryovers" in 2004. Both the Joint Committee on Taxation and the 2004 Conference Committee described the change as merely "clerical." *See* H.R. Rep. No. 108-696, at 90 (Sept. 30, 2004); Joint Committee on Taxation, Description of the "Tax Technical Corrections Act of 2003," JCX-104-03, at 4 (Dec. 3, 2003). Such a change was necessary, because the Rule used "carryovers" to mean both "carryforwards" and "carrybacks," but § 172, which the Rule discussed, used "carryovers" to mean only "carryforwards." Thus, the clerical change of wording sensibly eliminated an inconsistent usage of the same word in closely related sections of the Code.

same economic effect, it is not demonstrably at odds with Congress's intent for us to adhere to that meaning.

Metro argues that the plain meaning is demonstrably at odds with Congress's intent, because the Relief Rule "would not provide *any* benefit to taxpayers that generated positive AMTI through 2002 but struggled (and generated ATNOLs) thereafter" if "carryovers" means only "carryforwards." Metro argues this result opposes Congress's intent to "help struggling businesses," particularly those that struggled after September 11, 2001.  By focusing on this short phrase from the Rule's limited legislative history, Metro has "look[ed] over a crowd and pick[ed] out [a] friend[]." *Exxon Mobil*, 545 U.S. at 568.  However, there is no evidence that Congress intended to suspend the 90% limit in perpetuity following September 11.[13]  Moreover, taking the legislative history and the original Relief Rule together, we are confident that Congress was focused on providing the greatest economic stimulus during 2002 and 2003; determining what effect Congress intended the Rule to have beyond that would require speculation that we will not indulge.

Citing *Albertson's, Inc v. Comm'r*, 42 F.3d 537, 545 (9th Cir. 1994), Metro also argues that we should not adopt the plain meaning of "carryovers," because doing so will produce absurd results.  The absurd result Metro foresees is that the plain meaning "capriciously allows the Relief Rule to benefit ATNOLs carried back to 2001 and 2002 depending on whether and to what extent other ATNOLs are carried *forward* to the Carryover Year in question."  We disagree.

---

[13] Indeed, Congress eliminated the Relief Rule in 2009. *See* Worker, Homeownership, and Business Assistance Act of 2009, Pub. L. 111-92, § 13(b), 123 Stat. 2984, 2993–94 (2009).

Based on the little legislative history available, it is unclear that Congress was concerned about the ability of taxpayers in years after 2002 to take full advantage of the Relief Rule. The primary economic effect of the Relief Rule would have occurred in 2002 and 2003, based on the deductions and refunds it would generate. That economic effect depended, in large part, on a taxpayer having accumulated NOLs in prior years that it could carry forward to 2001 or 2002 to offset income in those years, or having excess income in *prior* years that could be offset by carrying back NOLs from 2001 or 2002. Therefore, to the extent that the Relief Rule has any economic effect after 2003, it would not be anomalous or "absurd" for the economic benefit to depend on the taxpayer having accumulated NOLs prior to 2001 that could be carried forward. Even in 2001 or 2002, much of the benefit of the Rule would only be available to taxpayers that had accumulated NOLs before 2001 or 2002.[14]

Therefore, the plain meaning of the term "carryovers" is consistent with its purpose as expressed in the limited legislative history and what we can infer from the economic effect of the original version of the Rule. Because the plain meaning of the term "carryovers" does not produce a result

---

[14] As the Commissioner points out, a taxpayer whose 2001 tax year ended prior to September 11, 2001 could have accrued NOLs in 2001 that could be carried back under the Relief Rule, even though it would be impossible for the losses that gave rise to the NOLs to have been caused by the September 11 terrorist attacks. Thus, regardless of whether "carryovers" means "carryforwards" or both "carryforwards" and "carrybacks," the extent to which a given taxpayer could benefit from the Rule could vary with the amount of pre-9/11 NOLs that the taxpayer had accrued. The fact that following the plain meaning of the term "carryovers" will have the same economic affect only confirms our reliance on it.

that is unreasonable and plainly at odds with the policy of this legislation, the term "carryovers" in § 56(d)(1)(A)(ii)(I) means NOLs that are carried forward from a tax year to a subsequent tax year.

## IV.    Conclusion

The Tax Court interpreted the term "carryovers" in the Relief Rule (§ 56(d)(1)(A)(ii)(I)) correctly, because it interpreted the term according to its plain meaning. The plain meaning is confirmed by the context of the Relief Rule and the sparse legislative history available for the statute.

**AFFIRMED**.